**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HSBC BANK USA, NATIONAL ASSOCIATION, ) <br> AS TRUSTEE FOR FREMONT HOME ) <br> LOAN TRUST 2005-A, MORTGAGE-BACKED ) <br> CERTIFICATES, SERIES 2005-A, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> SHIRLEY WILLIAMS; FIRST SECURITY ) <br> TRUST AND SAVINGS BANK, ) <br> ) <br> Defendants. ) | No. 12 C 9668 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

On December 5, 2012, Plaintiff HSBC Bank filed this action to foreclose a mortgage on residential property owned by Defendant Shirley Williams in Chicago.[1] The bank promptly served Ms. Williams with summons and, when she did not answer, obtained an order of default and judgment of foreclosure in March 2013. Almost a year later, HSBC moved for an order approving a report of sale and distribution. The purported sale occurred during a period when Defendant was actively negotiating a loan modification with Ocwen Loan Servicing (Plaintiff's agent), however, and Ocwen had repeatedly assured Ms. Williams that no sale would take place. The motion [26] is therefore denied without prejudice.

## FACTS

The parties disagree about the procedural history of this dispute, and each side has submitted records. At one point the court recruited counsel to represent Defendant Shirley Williams; that attorney scanned Ms. Willliams's paper records into electronic form, but took no further action. (*See* Oct. 15, 2014 Letter to Court [38], hereinafter "Def.'s Docs.") The account that follows is based on the court's own review of documents presented by both parties, and

---

[1] The court's jurisdiction is secure: Plaintiff is incorporated and has its principal place of business in Virginia. Defendant is a resident and citizen of Illinois.

includes, where possible, citations to the electronic docket.

As noted, HSBC Bank initiated this action in December 2012 (Compl. [1]), and promptly proceeded with service of process. Defendant Williams contests receiving service and asserts that she was not living at the residence in December 2012. (Def.'s Resp. to Pl.'s Mot. for Order Approving Sale [30], hereinafter "Pl.'s Resp.," 1.) The process server filed an affidavit that described the person he served; that description is consistent with Ms. Williams's physical appearance (Aff. of Special Process Server [5]), and the court is satisfied that Ms. Williams in fact received the relevant documents and that a judgment of foreclosure was properly entered in March 2013. (*See* 3/5/13 Minute Entry [13]; Order [14].)

Ms. Williams's unwillingness to recognize the validity of the judgment is understandable in light of subsequent events. After the March 5, 2013 order, HSBC took no prompt action to execute on its judgment or to seize and sell the property. Instead, through its agent, Ocwen Loan Servicing, Plaintiff entered into negotiations for a loan modification with Ms. Williams. The record of these negotiations is, not surprisingly, incomplete; Ms. Williams is a relatively unsophisticated borrower, and HSBC has no obvious interest in obtaining records from Ocwen that reflect repeated communications with Ms. Williams but include no reference to the entry of a judgment. From the materials that do appear in the record, primarily a series of form letters from Ocwen, the court has pieced together some of the history—a history that suggests near-complete failure of HSBC to communicate with its agent, Ocwen.

It is undisputed that at some point prior to September 2013, Ms. Williams applied for a loan modification. In a letter dated September 17, 2013, Ocwen advised Ms. Williams that her "recent application for a modification under the Making Home Affordable Program" had been denied. (Sept. 17, 2013 Letter from Ocwen, Def.'s Docs. at 25.) The letter explained that Ms. Williams was ineligible because Ocwen was "unable to create a post-modification monthly payment that is between 15% and 45% of [her] monthly gross income." (*Id.*) The form letter then invited Ms. Williams to contact Ocwen within 30 days to discuss the reason her

2

modification request had been denied "or to discuss alternative loss mitigation options that may be available to [her]." (*Id.*) The letter warned that "[y]our loan may be referred to foreclosure during this time, or any pending foreclosure action may continue," but makes no mention of the fact that a judgment of foreclosure had already been entered in March of 2013. (*Id.*) The letter continued with a confusing warning about the possibility of a foreclosure sale: it assured Ms. Williams that "no foreclosure sale will be conducted and you will not lose your home during this 30-day period" but that the foreclosure sale—which purportedly "will not be conducted"—would also not be suspended "if the court with jurisdiction over the foreclosure proceedings" or a bankruptcy court "refuses to halt the sale." (*Id.*) The letter identified three alternatives to foreclosure (a loan modification, a sale of the property, or a deed to Ocwen in lieu of foreclosure) and invited Ms. Williams to avail herself of "financial counseling services" through "HUD." (Defs.' Docs. at 26.) In the final sentence, Ocwen notified Ms. Williams that "Magdalena Gonzalez has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents." (*Id.*)

Whether Ms. Williams took any immediate action in response to the September 17, 2013 letter is unclear. What is clear is that she made further attempts to win approval for a loan modification. On November 18, 2013, she sent Ocwen's Loan Modification Department a handwritten document, titled "Hardship Letter," explaining that her account became delinquent when Fremont and Litton Servicing (evidently a previous loan servicer for Ms. Williams's loan) failed to provide her with the "1099c 'Cancellation of debt' form." (Hardship Letter, Defs.' Docs. at 48.) She had reportedly contacted "Ray" at Litton and "was told by Ray, that my house was written off as a forgiveness of debt and I would get a 1099C in time for 2012 tax season." (*Id.*) She never received the 1099C form, but instead received a bill from Ocwen and was advised that Ocwen had "bought my account in 2012, which should never have been sold." (*Id.*) Ms. Williams's "Hardship Letter" went on to identify various financial setbacks she suffered beginning in April 2011: the auto repair shop she ran had to be closed when the mechanic went

3

to jail; the tax business she operated took in just half of what it had earned in the past; she was diagnosed with a serious illness and went on disability; she and her husband separated in June 2011; and she spent much of 2012 dealing with health issues. (*Id.*) Ms. Williams provided the court with a second letter, also in her own handwriting and dated November 18, 2013. (Defs.' Docs. at 50.) In that letter, Angela Redmond, Larry Neuman, and Rickie Bass—who identified themselves as Ms. Williams's sister, son, and husband respectively—pledged their intention to "support[] her with $400 or more a month to help pay her bills" for "as long as she need [sic] us." (*Id.*)

On November 22, 2013, Ocwen sent another form letter to Ms. Williams, without indicating whether it had received her two November 18, 2013 letters. The November 22 letter merely stated that Ocwen was "pleased to assist [Ms. Wiliams] in identifying solutions for [her] mortgage" and again provided the name and contact information of Ms. William's "personal Relationship Manager, Magdalena Gonzalez," who would serve as her "dedicated mortgage assistance expert." (Defs.' Docs. at 3.)

On December 10, 2013, Rickie Bass, Ms. Williams's husband, signed a letter addressed to Ocwen, again apparently handwritten by Ms. Williams. (Defs.' Docs. at 49.) As the court understands this letter, Mr. Bass had proposed to be an additional borrower on a refinanced loan and was providing information about his own finances: His letter explained that he worked as an independent contractor whose clients paid him by check, but that he does not receive check stubs or have a checking account. (*Id.*)

While these communications between Williams and Ocwen were ongoing, Plaintiff took no further action to execute its judgment and took no further action in court. On February 19, 2014, new attorneys filed appearances on behalf of HSBC Bank. (Mot. by Pl. to Substitute Att'y 17].) These new attorneys sent Ms. Williams a letter by first class mail on February 24, 2014, explaining that their "client, Ocwen Loan Servicing, LLC, has referred the above referenced loan to our office to continue with the foreclosure proceedings." (Defs.' Resp. at 4.) Four days later,

4

on February 28, counsel filed a Notice of Special Commissioner's Sale, alerting Ms. Williams that a foreclosure sale would take place on March 12, 2014. That notice was served on Defendant Williams at her home address. (Notice of Special Commissioner's Sale [20].)

In the meantime, Ms. Williams continued working with Magdalena Gonzalez, her Ocwen "relationship manager." Ms. Williams contacted Magdalena Gonzalez at least a couple of times before March 10, 2014. Ms. Williams faxed a package of materials to Ocwen on that date, with a cover page directed to the attention of "Madalena [sic]." (Defs.' Docs. at 27.) The cover page states, "Per our conversation, the loan modification application (completed) is being faxed again for the 2nd time per your request." (*Id.*) Ms. Williams's note stated that the "fax number listed on the document did not work" but that she had obtained an alternative number from someone in "Cust. Serv." (*Id.*)

In the documents attached to the fax cover page, Ms. Williams noted that the property was her primary residence and that she wanted to keep the property. (Defs.' Docs. at 29.) She also listed her own name and that of her husband, Rickie Bass, as borrowers, claiming monthly income of $1,889.00 for herself and $1,189.00 for Mr. Bass. (Defs.' Docs. at 30, 33.) The bulk of her claimed income was business income derived from enterprises identified as "The Organizer Tax Office" and "Safe Living for Redemption," located side by side on S. Lowe Avenue in Chicago. (Defs.' Docs. at 34–39.) The package also contained executed forms for release of individual tax returns for both Ms. Williams and Mr. Bass. (Defs.' Docs. at 40–41.) In addition, it contained a "hardship statement" on which someone (presumably Ms. Williams) had checked boxes disclosing that she had suffered a decline in her household income and increased expenses due to marital separation, the disability of a borrower or family member, and unemployment. (Defs.' Docs. at 42.) Mr. Bass signed a non-borrower consent form, identifying himself as a person not liable on the original loan for the property "but whose income is used to support the mortgage payment or monthly expenses." (Defs.' Docs. at 44.) Both Ms. Williams and Mr. Bass signed an acknowledgement that the information provided was truthful.

5

(Defs.' Docs. at 46.) The Borrower Acknowledgement and Agreement form stated that the "Servicer [Ocwen] will not refer the loan to foreclosure or conduct the foreclosure sale" while the application for mortgage assistance was "under review," a process that would not begin "until all required documentation is received." (*Id.*) Again, however, the form warned that "the court having jurisdiction . . . may fail or refuse to halt the sale." (*Id.*)

Just two days later, on March 12, 2014, Ocwen furnished Ms. Williams with an "Important Notice About Your Recent Request for Mortgage Assistance." (Defs.' Docs. at 55.) The notice acknowledged that Ms. Williams had made a "Request for Mortgage Assistance" and assured her that Ocwen would review it promptly. (*Id.*) It made no mention of the foreclosure judgment entered on March 2013 or Special Commissioner's Sale, which had been initially scheduled for that day. (*See* 2/28/2014 Notice of Special Commissioner's Sale [20].) Instead, the notice warned that foreclosure could go forward during this period, and that she might "see steps taken to proceed with a foreclosure sale of your home." (*Id.*) It nevertheless assured that she would "not lose [her] home during the evaluation process," though she might need to respond to foreclosure notices. The notice again identified Magdalena Gonzalez as Ms. Williams's "relationship manager." (*Id.*)

The sale did not take place on March 12; nothing in the record explains how, why, or even when it was delayed. Six days after that original sales date, on March 18, Ocwen communicated with Ms. Williams again, notifying her that her "loss mitigation application" was incomplete and asking that she provide a statement confirming her eligibility for unemployment or public assistance benefits and further information concerning her employment—again, without any mention of the foreclosure judgment or sale. (Defs.' Docs. at 57.) Only two days later, on March 20—before Ms. Williams reasonably could have responded to the March 18 communication—Ocwen sent another document, this one titled "Loan Modification Application Review." (Mar. 20, 2014 Ocwen Letter to Ms. Williams, Ex. to Pl.'s Reply Mem. at 7 [41], 1.) This document explained that Ocwen was "unable to offer you a Modification plan because

6

there were missing or incomplete documents in your application." Ocwen asserted that it had given Ms. Williams notice of the deficiency "over 30 days ago" and directed her to respond within "30 calendar days from the date of this notice." (*Id.*) It also assured her again that "[n]o foreclosure sale will be conducted and you will not lose your home during this 30-day period." (*Id.*)

For her part, Defendant Williams continued her efforts to satisfy Ocwen that it should extend a loan modification. On April 9, 2014, she sent a fax to Magdalena Gonzalez at Ocwen, explaining that she was receiving "food stamps" benefits for six months, after which there would be a redetermination of her eligibility. ([Defs.' Docs. at 93–94.) The fax letter stated, further, that "the co-borrower has a new job at RoadLink, [for] which we are also submitting paperwork" reflecting a pay rate of $11.00 per hour. (*Id.*)

Ocwen's responses show that it was aware of these efforts, and again make no mention of the foreclosure judgment. Instead, Ocwen urged Ms. Williams to provide additional information necessary for a loan modification. In one such communication—undated but evidently sent by early April—Ocwen advised Ms. Williams that the "required documentation" must be "submitted by 4/14/2014," and that if she had not submitted a "complete package by 6/10/2014," she would need to start over, submitting a completely new application. (Defs.' Docs. at 58.) This notice assured her she would "not lose your home during the evaluation process," but warned that "to protect [her] rights under applicable foreclosure law," she would be required to respond to any foreclosure proceedings. (*Id.*) It appears Ocwen prepared a second such notice, identical in every respect except the date on which the documents were due; this second notice directs Ms. Williams to submit the required documentation by April 15, 2014 and warns that her application would expire if she had not submitted the "complete package" by July 10, 2014. (Defs.' Docs. at 60.) Yet another notice, otherwise identical to the first two, sets April 29, 2014 as the date by which required documentation must be submitted and August 3, 2014 as the date after which Ms. Williams would need to re-apply. (Defs.' Docs. at 67.) Though

7

inconsistent about the due dates, these three notices were consistent in assuring Ms. Williams that she would "not lose [her] home during the evaluation process . . . ."

Ms. Williams continued her attempts to comply with Ocwen's directions. She received another "Important Notice About Your Recent Request for Mortgage Assistance," this one dated April 16, 2014 and advising that her "loss mitigation application" was incomplete. (Defs.' Docs. at 59.) Specifically, Ocwen requested that Ms. Williams submit two recent pay stubs for each of the proposed borrowers. Again, Ms. Williams responded. On May 2, 2014, she sent a fax transmission to Magdalena Gonzalez at Ocwen, attaching a copy of a check stub issued to Mr. Bass, the proposed co-borrower, and explaining, "This is his 1st and only one he has received. He is a recent new hire as of 4/9/14." (Defs.' Docs. at 62.) The attached pay stub is dated April 30, 2014 and reflects net pay to Mr. Bass of $582.57 for a two-week period. (Defs.' Docs. at 63.) Ms. Williams also furnished Ocwen with a copy of an April 17, 2014 notice from the Illinois Department of Human Services, awarding her Supplemental Nutrition Assistance Program benefits through November 2014 in the amount of $189.00 per month. (Defs.' Docs. at 51, 52.) Other documents in the materials she furnished to the court include what appears to be a record of fees she had recovered (or expected to recover) from a tax preparation business in February and March 2014. (Defs.' Docs. at 53, 54.)

Ocwen's response to these submissions is bewildering. On May 5, 2014, Ocwen notified Ms. Williams that her application for a loan modification had been rejected. (Defs.' Docs. at 64.) At this point, Ocwen said nothing about Ms. Williams's efforts to qualify for a loan modification, made no reference to her failure to meet deadlines, and again did not specifically mention a previous foreclosure. What the notice did explain is that Ocwen was unable to offer the modification because "[a]s of the date of this letter [her] loan has a confirmed sale date within 7 days"—without actually specifying the date of the sale. This letter came despite Ocwen's repeated assurances that Ms. Williams "would not lose her home" while her request for a loan modification was under review. (*Id.*) The May 5 notice did allow for a 30-day appeal period,

and assured her, yet again, that "[n]o foreclosure will be conducted and you will not lose your home during this 30-day period," unless a court refused to halt the sale "despite [Ocwen's] reasonable attempts to delay" it. (*Id.*) Ms. Williams asserts that when she received this May 5, 2014 notice, "our rep [presumably, Ms. Gonzalez] informed me to disregard this letter per her supervisor, as our application was already submitted 30 days prior to the Sale date, . . . ." (Letter of October 15, 2014, Defs.' Docs. at 2.) The May 5, 2014 notice went on to list alternatives that might be available to Ms. Williams: a loan modification; a sale of the property; or a deed in lieu of foreclosure. The second page of the notice encouraged Ms. Williams to "begin the process of working with [Ocwen] to identifying [sic] a solution to resolving your delinquent mortgage loan." (Defs.' Docs. at 65.) If she were to visit Ocwen's website and furnish financial information, the notice assured her, a "Home Retention Consultant" would review that information and "then contact [her] to discuss potential resolution options." (*Id.*) Again, Ocwen identified Magdalena Gonzalez as the "relationship manager" who would be Ms. Williams's "designated representative for resolution inquiries and submission of documents." (*Id.*)

If that May 5, 2014 notice were not confusing enough, Ocwen sent a second notice three days later. In the "Important Notice About Your Recent Request for Mortgage Assistance," dated May 8, 2014, Ocwen made no mention of a foreclosure or of any confirmed sale date. (Defs.' Docs. at 66.) Though HSBC now reports that the foreclosure sale took place on May 9, 2014 (*see* Report of Sale and Distribution [22-1]), Ocwen's May 8 letter said nothing about this. Instead, it returned to a discussion of information necessary for a loan modification, notifying Ms. Williams that her loss mitigation application was "incomplete" and directing her to furnish "written authorization to consider non-borrower income" and "[a]dditional information . . . regarding the borrower's employment." (*Id.*) In a separate May 8, 2014 letter, Ocwen advised that a "Non-Borrower Verification Form" must be submitted "within 10 days of the date of this letter." (May 8, 2014 Ocwen letter to Ms. Williams, [42], 12.)

9

From this record, it appears that HSBC Bank, or its lawyers, or both, were unaware of Ocwen's activities. On May 23, 2014, counsel filed a motion for an order approving the report of sale and for an order of possession of the property, noticed for hearing on June 2, 2014. (Mot. by Pl. for Order Approving Report of Sale [22]; Notice of Motion for presentment of motion on 6/2/2014 [23].) Notice of that motion and hearing were served on Ms. Williams at her home.

Perhaps on the strength of Ocwen's repeated assurances that a sale would take place only if the court refused to delay it, Ms. Williams continued her efforts to obtain a loan modification, sending further documentation by fax to Ocwen on May 27, 2014. A fax cover sheet bearing that date appears among the materials she submitted to the court (Defs.' Docs. at 96); though the court is uncertain what was attached to it, later correspondence suggests that it included additional information concerning Mr. Bass's income. Evidently in response, Ocwen sent Ms. Williams another Loan Modification Application Review notice on June 2, 2014. (June 2, 2014 Letter to Ms. Williams, Ex. to Pl.'s Reply Mem. at 16 [41].) This one made no mention of the "confirmed sale date" referred to a month earlier in the May 5, 2014 letter. Instead, the June 2, 2014 notice announced that Ms. Williams's "loan has undergone foreclosure and the property is currently being *marketed for sale*." (*Id.,* emphasis supplied.) It went on to direct Ms. Williams as follows: "Please contact our representatives at 1-800-74-OCWEN (1-800-746-2936) to discuss the status of the p   " (*Id.*) What exactly Ocwen meant by "the p  " is unexplained.

The foreclosure sale that HSBC now asks the court to confirm had occurred on May 9, 2014, three weeks before the June 2 letter. That letter nevertheless once again assured Ms. Williams that *"[n]o foreclosure sale will be conducted* and you will not lose your home during this 30-day period" unless a court refused to halt the sale "despite our reasonable attempts to delay" it. (*Id.* emphasis supplied.) The third page of this June 2 notice assured Ms. Williams that "modification options and foreclosure alternatives" were available, and urged her to "[c]ontact us right away . . . ." (*Id.* at 3.)

10

On the very day Ocwen sent her this June 2, 2014 notice, Ms. Williams was in court for a hearing on the Bank's motion for an order approving the report of sale of the property. Ms. Williams claimed she had been unaware of the foreclosure proceeding until she received notice of that motion, and that she was in negotiations with Ocwen for a loan modification. The court continued the motion for three weeks, to allow counsel to investigate the status of the negotiations. (6/2/2014 Minute Entry [24].)

In the meantime, Ms. Williams again communicated with Magdalena Gonzalez. Ina June 11, 2014 fax, Ms. Williams explained that she was attempting, at this court's direction, to proceed with the loan modification application but "every time I try to set up a call with you through customer service, they don't see the update from the attorney." (Defs.' Docs. at 70.) Ms. Williams reminded Ms. Gonzalez that she had submitted the "2nd check stub and nonborrower form on 5/27/2014." (*Id.*) She attached another check stub for Rickie Bass, this one dated May 23, 2014, and reflecting net payment to him of $630.32 for the two week period from May 4 through May 17. (Defs.' Docs. at 71.) Also included in the packet of documents she submitted is Mr. Bass's tax returns for 2012 and 2013, in which he reported adjusted gross income of $20,540.00 for 2012 and $12,548.00 for 2013. (Defs.' Docs. at 75–92.)

When the parties appeared in court again on June 23, 2014, Ms. Williams again reported she was involved in loan modification efforts, and that Ocwen's representatives had said nothing to her about the foreclosure or a scheduled sale. The Bank's counsel has not disclosed the results of the investigation, if any, she conducted at the court's direction. This court's own review of the records confirms that Ocwen never advised Ms. Willliams that her property had "undergone foreclosure" until June 2, three weeks after the sale occurred. The court denied the motion for an order approving the report of sale without prejudice (6/23/2014 Minute Entry [25].) The Bank's renewed motion for such approval [26] is now before the court, supported by a memorandum and exhibits (Pl.'s Mem in Supp. of its Mot. [29], hereinafter "Pl.'s Mem.").

11

## DISCUSSION

The Illinois Mortgage Foreclosure Law ("IMFL") governs this procedure and provides that, after a Judgment of Foreclosure has been entered and the foreclosed property is sold, the Plaintiff must return to court to have the sale approved. The statute provides that the court shall enter an order confirming the sale unless "(i) a notice required in accordance with subsection (c) of § 15-1507 [that is, public notice of the foreclosure sale] was not given; (ii) the terms of the sale were unconscionable; (iii) the sale was conducted fraudulently, or (iv) justice was not otherwise done . . . ." 735 ILCS 5/15-1508(b). Plaintiff argues that none of these circumstances exist here. HSBC contends it has complied with relevant notice requirements, as reflected in the Certificate of Publication. (Pl.'s Mem. at 3; Certificate of Publication [21].) Nor is there evidence that the sale was unconscionable: The original loan on the property was in the amount of $100,000 (Complaint [1] ¶ 10(h)), and though the sale price was just $42,000 (Report of Sale and Distribution [21-1]), as Plaintiff notes, mere inadequacy of prices does not establish that a sale is unconscionable, absent fraud or a violation of duty by the officer conducting the sale. *World Sav. & Loan Ass'n. v. Amerus Bank*, 317 Ill. App.3d 772, 780, 740 N.E.2d 466, 474 (1st Dist. 2000) ("property does not bring its full value at forced sales and . . . the price depends on many circumstances for which the debtor must expect to suffer a loss."). There is no suggestion of fraud in the sale itself.

That leaves the question whether "justice was not otherwise done" in connection with the sale. The statute does not define injustice under this provision, but courts understand that the language is an attempt to "merely codify the long-standing discretion of the courts of equity to refuse to confirm a judicial sale . . . where unfairness is shown. . . ." *Wells Fargo Bank, N.A. v. McCluskey*, 376 Ill. Dec. 438, 444, 999 N.E.2d 321, 327 (Ill. 2013). Citing *Shultz v. Milburn*, HSBC Bank points out that this discretion is not limitless: Ordinarily, courts will not "in the absence of fraud or irregularity, refuse to confirm a judicial sale, or order a resale, on the motion of an interested party, merely to protect himself against the result of his own negligence . . . ."

366 Ill. 400, 405, 9 N.E.2d 199, 201 (Ill. 1937). In renewing its motion for an order approving the sale, HSBC Bank argues that there is no fraud or irregularity in this record, and that Ms. Williams's objection to the motion are mere efforts to protect herself against the results of her own negligence. The Bank offers no comment on the consistent, documented correspondence between Ms. Williams and the loan servicer, Ocwen. Instead, the Bank asserts that "the sale of the foreclosed property was scheduled for March 12, 2014, which was continued to May 9, 2014 to review Defendant for a loan modification." (Pl.'s Mem. at 1.) The Bank has not bothered to identify records of these purported events, nor is there any evidence that Ms. Williams herself understood that the sale was going forward despite Ocwen's assurances to the contrary, or was ever notified that it had been postponed to May. Instead, over the course of several months, Ms. Williams communicated with Ocwen, furnishing requested financial information in an effort to satisfy Ocwen that she qualified for a loan modification. In its form-letter responses, Ocwen assured her repeatedly that she would not lose her property, and that there would be no foreclosure sale unless a *court* (not Ocwen itself) refused to delay such a sale.

Case authority teaches that, before ruling on a petition to confirm a foreclosure sale, the court is expected to "consider the interests of all parties . . . ." *Fleet Mortgage Corp. v. Deale*, 287 Ill. App.3d 385, 392, 678 NE.2d 35, 40 (1st Dist. 1997). This includes the interest of any third party involved in the sale, as explained in the case emphasized by Plaintiff, *Aurora Loan Services, Inc. v. Craddieth,* 442 F.3d 1018 (7th Cir. 2006)—a consideration not directly relevant here, as it was HSBC Bank itself who was the successful bidder at the sale in this case. It is appropriate for the court to refuse to approve a judicial sale "if unfairness is shown which is prejudicial to an interested party." *Citicorp Savings of Illinois v. First Chicago Trust Co. of Illinois*, 269 Ill. App.3d 293, 300, 645 N.E. 2d 1038, 1045 (1st Dist. 1995). In *Fleet Mortgage*, for example, the court upheld an order denying a motion to confirm a foreclosure sale that the bank had mistakenly scheduled during the statutory redemption period. In *Citicorp,* when the borrower failed to make a payment, the court entered a judgment of foreclosure. 269 Ill. App.3d

13

at 295, 645 N.E. 2d at 645 N.E. 2d 1042. Even though the statutory right to make a late payment and reinstate the mortgage had expired, the lender set a later date for reinstatement and assured the borrower that any foreclosure sale would be postponed until after that date. *Citicorp*, 269 Ill. App.3d at 300, 645 N.E. 2d at 645 N.E. 2d 1045. The court refused to enter an order confirming the foreclosure sale, and the appellate court affirmed, observing that "it would not be in the interests of justice for the court to have confirmed the sale of the property after [the lender] affirmatively represented to [the borrowers] that a sale would not take place." *Citicorp*, 269 Ill. App.3d at 300-01, 645 N.E.2d at 1045.

HSBC Bank's loan servicer, Ocwen, made similar representations in this case: in response to Ms. Williams's loan modification efforts, Ocwen repeatedly assured her that no sale would take place and that she would not lose her home. Ocwen set several deadlines for submission of materials in support of a proposed loan modification, some of which post-dated the sale that occurred here. HSBC Bank now urges that it would be improper for this court to vacate the sale "where the defendant has demonstrated severe negligence by failing to appear and defend herself . . . ." (Pl.'s Mem. at 7.) As described above, Ms. Williams disputes having received service of process in this case. The court has resolved that dispute in favor of the Bank, and it appears uncontested that the Bank is entitled to a judgment of foreclosure. No fair reading of this record, however, supports the conclusion that Ms. Williams demonstrated "severe negligence" with respect to the judicial sale. It was the Bank that delayed that process for almost a year. It was the Bank's agent, Ocwen, that engaged in repeated communications with Ms. Williams, requesting information from her, assuring her that she "would not lose" her property, and never once mentioning the entry of a default foreclosure judgment. Plaintiff now argues that as of May 9, "after a proper review was conducted, [Ms. Williams] simply did not qualify [for a loan modification]" (*Id.* at 8–9)—but HSBC Bank offers no evidence of any such "proper review" or that Ms. Williams was ever explicitly notified her application had been turned down. To the contrary, Ocwen was actively engaged in negotiations with Ms. Williams as of that

date and had set a much later date as a deadline for her submission of additional documentation: Ocwen's May 5 letter allowed for a 30-day appeal period and explicitly promised that there would be no foreclosure sale unless a court refused to delay such a sale despite Ocwen's "reasonable attempts to delay it."[2] There were apparently no attempts, reasonable or otherwise, to delay the sale that in fact took place just four days after that communication. Negligence, if any, in connection with this foreclosure sale was not that of the borrower.

## **CONCLUSION**

Ocwen assured Plaintiff there would be no foreclosure sale while her loan modification application was under consideration. The application was in active negotiation, and to the extent some of Ocwen's communications are deemed a denial of the application, the 30-day appeal period had not expired. As described above, communications between HSBC's loan servicer, Ocwen, and Defendant Williams were riddled with inconsistency and confusion. The record cries out for an explanation of the decision to proceed with a sale, but HSBC offers none. In this court's view, the circumstances here rise to the level of "irregularity" supporting denial of

---

[2]   In its briefs, HSBC refuses even to acknowledge this communication, though it may have been made in an effort to comply with Home Affordable Modification Program regulations that Plaintiff itself has attached as exhibits to its Memorandum in Support of its Motion for Order Approving Sale [29-2.] Specifically, regulations in the then-current Making Home Affordable Handbook, published by the U. S. Department of Treasury, provide:

> With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP ["Trial Period Plan"] based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

MHA Handbook v4.3, https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_43.pdf (last visited March 30, 2015).

The regulations explain, further, that the servicer will not be in violation of these provisions if a court orders otherwise, or action is necessary to protect the interests of the owner of the loan, or if there simply is no time to stop further steps, "*provided that in no event shall the servicer permit a sale to go forward.*" *Id.* (emphasis supplied).

the motion for confirmation of the foreclosure sale.

In reaching this conclusion, the court recognizes that HSBC's judgment of foreclosure remains in effect. It may well be impossible for Ms. Williams or her family to arrange for a loan modification or ever to bring her indebtedness current. Before proceeding to a sale, however, HSBC will need to communicate directly and clearly with her, setting forth consistent deadlines and enforcing them. The motion for an order confirming the sale [26] is denied.

ENTER:

Dated: March 30, 2015

_____
REBECCA R. PALLMEYER
United States District Judge